## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Docket No. 1:18-cv-44-NT |
| | ) | |
| DOUGLAS MELTZER, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| RODNEY N. FISHER, | ) ) | |
| Appellant, | ) ) | |
| v. | ) | Docket No. 1:17-cv-256-NT |
| | ) | |
| LINCOLN PAPER AND TISSUE, LLC, *et al.*, | ) ) ) | |
| Appellee. | ) ) | |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND
## RODNEY N. FISHER'S MOTION FOR LEAVE TO APPEAL

In these consolidated adversary proceedings, the Official Committee of Unsecured Creditors of Lincoln Paper and Tissue, LCC ("**the Committee**") asserts claims on behalf of Lincoln Paper and Tissue, LCC ("**the Debtor**") and the Debtor's bankruptcy estate against the Debtor's former board members, Rodney N. Fisher ("**Fisher**"), Douglas L. Meltzer ("**Meltzer**"), Edward Dan Herring ("**Herring**"), Keith Van Scotter ("**Van Scotter**"), and John Wissmann ("**Wissmann**") (collectively, the "**Board Members**"), and against the Debtor's sole member, LPT Holding, LLC ("**LPTH**," and together with the Board Members the "**Defendants**").

This action involves two operative complaints, the first against Meltzer, Herring, Fisher, and LPTH, *Official Comm. of Unsecured Creditors v. Fisher*, Docket No. 1:17-ap-1005 (ECF No. 1) (the "**MHF Complaint**"), and the second against Van Scotter and Wissmann. First Amended Complaint, *Official Comm. of Unsecured Creditors v. Van Scotter*, Docket No. 1:16-ap-1020 (ECF No. 139) (the "**VSW Complaint**," and with the MHF Complaint the "**Complaints**").[1] The MHF Complaint asserts claims for breaches of the duties of loyalty and care against Meltzer, Fisher, and Herring (Counts I & II); claims for avoidance and recovery of transfers against LPTH, Fisher, and Meltzer (Counts III-X); and a request for declaratory judgment against Meltzer (Count XI). MHF Compl. The VSW Complaint asserts claims against Van Scotter and Wissmann for breach of the duty of loyalty (Count I), breach of the duty of care (Count II), and avoidance and recovery of transfers (Counts III-VI). VSW Compl.

Before me are Fisher's motion to dismiss Count I of the MHF Complaint (ECF No. 150) ("**Fisher Mot.**"), Meltzer and Herring's motion to dismiss the MHF Complaint (ECF No. 151) ("**MH Mot.**"), and Van Scotter and Wissmann's motion to dismiss Count I of the VSW Complaint (ECF No. 149) ("**VSW Mot.**"). Also before me is Fisher's Motion for Leave to Appeal the Bankruptcy Court's April 13, 2017, Order granting the Committee derivative standing to sue Fisher and the Bankruptcy Court's June 22, 2017, Order denying Fisher's Rule 59(e) motion to alter the order

---

[1]     Unless otherwise specified, all electronic case filing numbers herein refer to *Official Comm. of Unsecured Creditors v. Van Scotter*, Docket No. 1:16-ap-1020 (Me. Bankr.).

granting standing. *Fisher v. Lincoln Paper & Tissue, LLC*, Docket No. 1:17-cv-256 (ECF No. 1). For the reasons set forth below, I **GRANT** Fisher's motion to dismiss, **GRANT IN PART** and **DENY IN PART** Meltzer and Herring's motion to dismiss, and **GRANT** Van Scotter and Wissmann's motion to dismiss. I also **DENY** Fisher's motion for leave to appeal.

## FACTUAL BACKGROUND[2]

### I.     The Debtor and the Defendants

The Debtor is a Delaware limited liability company, as is the Debtor's sole member, LPTH. VSW Compl. ¶¶ 7, 12. The Debtor and LPTH share the same five board members: Fisher, Herring, Meltzer, Van Scotter, and Wissmann. VSW Compl. ¶ 7. In addition to being part of the Debtor's board, Van Scotter serves as the Debtor's Chief Executive Officer and Wissmann is the Debtor's Chief Financial Officer. VSW Compl. ¶¶ 5-6. Fisher, Van Scotter, and Wissmann are also members of LPTH. VSW Compl. ¶¶ 5-6, 8.

Meltzer and Herring are not members of LPTH. However, both were appointed to the Debtor's and LPTH's boards by CalPERS Corporate Partners, LLC, which is a member of LPTH. VSW Compl. ¶¶ 9-11. Meltzer is the managing partner of CalPERS's managing agent, KMCP Advisors II, LLC ("**KMCP**"). VSW Compl. ¶ 9. In

---

[2]     The facts below are drawn from the allegations in the MHF and VSW Complaints, which I take as true for the purposes of deciding the motions to dismiss, and from documents explicitly relied upon in or integral to the MHF Complaint, which I may consider under *Watterson v. Page* without converting a motion to dismiss into one for summary judgment. 987 F.2d 1, 3 (1st Cir. 1993). With limited exceptions noted below, the Complaints contain identical allegations. For ease of distinction, I refer generally to the VSW Complaint and refer to the MHF Complaint only when discussing allegations that appear only in that Complaint.

addition to being CalPERS's managing agent, KMCP is a co-founder and managing partner of Silver Canyon Group, LLC ("**SCG**"), a private equity firm that CalPERS used to facilitate a loan to the Debtor as part of the transaction in which CalPERS obtained its membership interest in LPTH. VSW Compl. ¶¶ 9-10. Herring is a representative and senior advisor to SCG. VSW Compl. ¶ 10.

## II.     The Boiler Explosion and the Debtor's Insurance Settlement

Until late 2015, the Debtor operated a pulp, paper, and tissue mill in Lincoln, Maine. VSW Compl. ¶ 12. As part of its operations, the Debtor produced its own pulp using a recovery boiler. VSW Compl. ¶¶ 13, 15. The boiler afforded the Debtor significant cost savings over its competitors by allowing the Debtor to avoid purchasing pulp from third parties and by generating enough steam power to meet approximately half of the mill's energy requirements. VSW Compl. ¶¶ 13-17.

On November 2, 2013, an explosion at the mill badly damaged the boiler, which had to be shut down. VSW Compl. ¶¶ 18-19. The Debtor had an insurance policy with Factory Mutual Insurance Company ("**FM Global**") that provided for replacement cost coverage, with an adjusted cash value provision, as well as business interruption coverage with a total limit of $ 543 million. VSW Compl. ¶ 24. The Debtor immediately notified its insurer of the explosion, and shortly thereafter the Board Members accepted a $ 10 million insurance advance to cover the Debtors' business interruption costs. VSW Compl. ¶¶ 25-26. The Board Members obtained two estimates for the boiler's repair, which suggested that fixing the boiler would cost approximately $ 30-32 million and would take four to six months. VSW Compl. ¶ 27. The Board Members estimated that without an operational boiler, the Debtor's

earnings before interest, tax, depreciation, and amortization would drop to a loss of $ 2.9 million per month, the Debtor would not be able to retain its pre-explosion pricing structure, and the Debtor risked business interruption costs and expenses of $ 4-6 million per month. VSW Compl. ¶¶ 22-23, 26.

On December 9, 2013, the Board Members met to discuss whether to cause the Debtor's insurer to fund the boiler repair, or whether to instead negotiate a cash settlement of the Debtor's insurance claim and to continue operating the mill without the boiler. VSW Compl. ¶ 28. The Board Members projected that if they opted to repair the boiler, LPTH and its members would not receive any distributions in 2013 or 2014. VSW Compl. ¶ 29. Alternatively, if the Debtor pursued a cash settlement, the Board Members projected that the Debtor would likely make distributions of roughly $ 10 million to LPTH in 2014 and, possibly, 2013. VSW Compl. ¶ 29. The Board Members did not consult with any independent advisors or consider outside opinions about the viability of their business plan to operate the mill without a functional boiler, relying solely on internal discussions and projections. VSW Compl. ¶ 32.

The Board Members voted unanimously in favor of pursing the cash settlement. VSW Compl. ¶ 31. On December 10, 2013, the Board Members authorized the Debtor to accept a $ 49.8 million settlement of its insurance claim, which included the $ 10 million advance that the Debtor had previously received. VSW Compl. ¶ 33.

## III. The First Distribution

On December 17, 2013, the Board Members voted to authorize the Debtor to distribute $ 3 million of the insurance settlement funds to LPTH, and then to LPTH's

members (the "**First Distribution**"). VSW Compl. ¶ 35. Of that $ 3 million, Fisher, Wissmann, and Van Scotter received distributions of $ 354,759.00, $ 487,024.00, and $ 530,796.00, respectively. VSW Compl. ¶ 36. Meltzer and Herring received no part of the distributions, however CalPERS received a distribution of $ 1,050,000.00 through its managing agent, KMCP. VSW Compl. ¶ 37.

The same day that the Board Members voted to approve the First Distribution, they discussed the possibility that the Debtor would eventually need to shut down its operations at the mill due to its poor financial condition. VSW Compl. ¶ 41. At the time that they made their decisions to accept the insurance settlement and to make the First Distribution, the Board Members also knew or should have known of various risks to the Debtor's financial health that could materialize if the boiler was not rebuilt. These included that (1) JPMorgan Chase, the Debtor's lender, considered the explosion a material adverse development that would allow JPMorgan to accelerate the Debtor's $ 20.8 million debt if the boiler was not rebuilt; (2) the Debtor would incur costs of approximately $ 10.85 million in changing its operations to accommodate the loss of the ability to produce pulp and power; and (3) the Debtor had already spent approximately $ 6 million of the settlement funds to cover business interruption costs as of December 9, 2013, and the Debtor would continue accruing such costs. VSW Compl. ¶ 38. The Board Members also knew that if the Debtor did not rebuild the boiler, the Debtor's primary natural-gas using asset, the Debtor would not meet its minimum purchase requirement with its natural gas supplier, causing the Debtor to breach its supply contract and exposing it to $ 1 million in damages.

VSW Compl. ¶ 40. The Board Members were further aware that the Federal Energy Regulatory Commission had issued an order imposing a $ 5 million penalty against the Debtor for alleged regulatory violations and demanding disgorgement of $ 379,016.00 in past payments. VSW Compl. ¶ 39.

## IV.    The Second Distribution

On May 12, 2014, the Board Members convened again to discuss whether to authorize a $ 4 million distribution from the settlement funds to LPTH and to LPTH's members. VSW Compl. ¶ 43. During that meeting, Herring asked Wissmann and Van Scotter to provide updated financial projections for the Debtor in support of the proposed distribution. VSW Compl. ¶ 44. Wissmann and Van Scotter did not provide the updated projections. VSW Compl. ¶ 45. Nevertheless, on May 16, 2014, a majority of the Board Members comprising Van Scotter, Wissmann, and Fisher[3] voted to authorize the Debtor to make the proposed $ 4 million distribution (the "**Second Distribution**," and together with the First Distribution the "**Distributions**"). *See* VSW Compl. ¶ 46. Of the $ 4 million distribution, Fisher, Wissmann, and Van Scotter received distributions of $ 475,398.00, $ 652,628.00, and $ 711,285.00, respectively. VSW Compl. ¶ 47. CalPERS received $ 1,407,035.00 through KMCP. VSW Compl. ¶ 48.

---

[3]    While the Complaints allege only that a "majority" of the Debtor's board voted in favor of the Second Distribution, the Committee concedes that the referenced majority did not include Meltzer and Herring. This is consistent with the Committee's Initial Complaint, which expressly alleged that only Van Scotter, Wissmann, and Fisher voted in favor of the Second Distribution. Complaint ¶ 44, No. 1:16-ap-01020 (Me. Bankr. Sept. 13, 2016) (ECF No. 1).

## V.     The Release and the Debtor's Bankruptcy

The Distributions left the Debtor in financial distress and without adequate capital. VSW Compl. ¶ 51. Approximately seven months after the Second Distribution, the Debtor was forced to seek additional financing in order to maintain its operations. VSW Compl. ¶ 52. On December 11, 2014, the Debtor entered into a set of loan agreements with Siena Lending Group LLC, pursuant to which Siena provided the Debtor with a credit line with a $ 6 million limit. VSW Compl. ¶ 53.

The Debtor was unable to survive as a going concern, and in April 2015 it retained SSG Advisors LLC to market its business. VSW Compl. ¶¶ 54-55. SSG was unable to find a buyer. VSW Compl. ¶ 54.

On July 27, 2015, CalPERs entered into a Membership Assignment Agreement through which it purported to sell all of its Class C LLC Units and Membership Interest in LPTH to Van Scotter, Fisher, Wissmann, and Stanley Okoro ("**Okoro**") (a member of LPTH). MHF Compl. ¶ 56. In connection with that transaction, CalPERS and Meltzer entered into a general, mutual release of liability with the Debtor, LPTH, Fisher, Van Scotter, Wissmann, and Okoro (the "**Release**"). MHF Compl. ¶ 55. The Release stated that:

> In consideration of the mutual covenants contained herein, and in reliance upon the agreements and releases of the parties as set forth herein, the parties, intending to be legally bound, agree as follows: . . .
>
> [CalPERS] and Meltzer, each on their behalf . . . hereby irrevocably and unconditionally releases, covenants not to sue, acquits and forever discharges LPT Holding, LPT, Fisher, Okoro, Van Scotter, Wissmann . . . from, regarding, and/or on account of any and all claims, debts, causes of action, liens, suits or other liabilities whatsoever, whether known or unknown, suspected or unsuspected, from the beginning of time up to and including the date of this General Release.

General Release 1 (ECF No. 151-1). However, Meltzer provided no consideration for the Release. MHF Compl. ¶ 55.

Two months later, on September 28, 2015, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. VSW Compl. ¶ 56.

## PROCEDURAL BACKGROUND

On September 13, 2016, the Committee began an adversary proceeding by filing a complaint against the Defendants. (ECF No. 1) (the "**Initial Complaint**"). On November 16, 2016, Meltzer and Herring moved to dismiss the Initial Complaint. (ECF No. 34.) Fisher moved to dismiss the Initial Complaint on December 5, 2016 (ECF No. 48), and on February 28, 2017, LPTH joined in the other defendants' motions to dismiss. (ECF No. 91.) On March 3, 2017, Judge Cary granted the motions and dismissed Meltzer, Herring, Fisher, and LPTH for lack of standing. (ECF No. 93.) The Committee subsequently moved for leave to assert claims against the dismissed parties on behalf of the Debtor's estate, and the Bankruptcy Court granted the Committee standing to sue Meltzer, Herring, Fisher, and LPTH on April 13, 2017. *In re Lincoln Paper & Tissue, LLC*, Docket No. 15-10715 (ECF No. 980). On April 27, 2017, Fisher moved for reconsideration of the Bankruptcy Court's decision to grant the Committee standing to sue. *In re Lincoln Paper & Tissue, LLC*, Docket No. 15-10715 (ECF No. 998). The Bankruptcy Court denied Fisher's motion for

reconsideration during a hearing on June 20, 2017. *In re Lincoln Paper & Tissue, LLC*, Docket No. 15-10715 (ECF No. 1035). [4]

On April 17, 2017, the Committee commenced a separate adversary proceeding against Meltzer, Herring, Fisher, and LPTH by filing the MHF Complaint. MHF Compl. On May 30, 2017, the Committee moved to consolidate the adversary proceedings, and Judge Cary granted the motion to consolidate on July 6, 2017. In the interim, Meltzer, Herring, Fisher, and LPTH moved to withdraw the reference to this Court as to both adversary proceedings, and I temporarily stayed those motions for settlement negotiations. *See Meltzer v. Official Comm. of Unsecured Creditors*, Docket No. 1:17-mc-144 (ECF Nos. 1, 6). During the run of that stay, on September 19, 2017, the Committee filed a First Amended Complaint against Van Scotter and Wissmann, which included limited amendments to the Initial Complaint's factual allegations and which added a claim for breach of the duty of loyalty. *See* VSW Compl.

---

[4]     Fisher's motion for leave to appeal the Bankruptcy Court's order granting the Committee derivative standing to sue him is groundless. *Fisher v. Lincoln Paper & Tissue, LLC*, Docket No. 1:17-cv-256 (ECF No. 1-4). Even if I had the authority to entertain an interlocutory appeal of that order— which is questionable given Fisher's failure to raise "an important and unsettled question of controlling law," *United States v. Sorren*, 605 F.2d 1211, 1213 (1st Cir. 1979)—I would affirm the Bankruptcy Court's decision. A debtor "may stipulate to representation by [a] . . . creditors' committee '[s]o long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial." *In re Commodore*, 262 F.3d 100-01 (quoting *In re Spaulding Composites Co.,* 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997)). The Committee asserted in its motion for derivative standing that the Debtor consented to the relief requested, and that consent is borne out by the comments of the Debtor's counsel at the hearing on that motion. Official Committee of Unsecured Creditors' Motion ¶ 18, *In re Lincoln Paper & Tissue, LLC*, Docket No. 15-10715 (ECF No. 919); *see also* Transcript Regarding Hearing Held 04/12/17 at 31:1-5, *In re Lincoln Paper & Tissue, LLC*, Docket No. 15-10715 (ECF No. 991). As to whether the litigation will be beneficial to the estate, Fisher has himself posited that the Complaints represent "exposure" of nearly $ 50 million. Appellant's Br. 29, *Fisher v. Official Comm. of Unsecured Creditors*, Docket No. 1:17-cv-255-NT (ECF No. 1). Although litigation costs and attorneys fees have and will consume a fair amount of an eroding $ 10 million Directors & Officers insurance policy held by LPTH, there is still a possibility of a substantial recovery from the policy as well as from various parties in their personal capacities. It is clear from the record that Judge Cary exercised appropriate oversight in allowing the Committee to proceed with the litigation. Accordingly, I DENY Fisher's motion for leave to appeal.

After the stay was lifted, the Committee elected not to object to the motions to withdraw the reference, which I granted on January 31, 2018. *Meltzer v. Official Comm. of Unsecured Creditors*, Docket No. 1:17-mc-144 (ECF No. 13). My consideration of the motions to dismiss, which had been pending before the Bankruptcy Court, followed.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement "needs only enough detail to provide a defendant with fair notice of what the . . . claim is and the grounds upon which it rests." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (quotations omitted).

Federal Rule of Civil Procedure 12(b)(6) allows a party to seek dismissal of "a claim for relief in any pleading" if that party believes that the pleading fails "to state a claim upon which relief can be granted." In assessing a motion to dismiss under Rule 12(b)(6), a court "assume[s] the truth of all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *Román–Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011) (quotations omitted). "Well-pleaded facts must be 'non-conclusory' and 'non-speculative.' " *Barchock v. CVS Health Corp.*, No. 17-1515, 2018 WL 1444333, at *4 (1st Cir. Mar. 23, 2018). To overcome a motion to dismiss, a plaintiff must establish that their allegations raise a plausible basis for a fact finder to conclude that the defendant is legally responsible for the claims at issue. *Román–Oliveras*, 655 F.3d at 49.

## LEGAL BACKGROUND

## I.    Breach of Fiduciary Duties

Where there is no language "in an LLC agreement to the contrary, the managers of an LLC owe traditional fiduciary duties of care and loyalty."[5] *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, No. CV 9380-VCP, 2015 WL 1839684, at *11 (Del. Ch. Apr. 21, 2015); *see also* 6 Del. C. §§ 18-1101(c), 18-1104.[6]

## A.    The Fiduciary Duty of Loyalty

"A plaintiff can call into question a director's loyalty by showing that the director was interested in the transaction under consideration or not independent of someone who was." *Quadrant Structured Prod. Co., Ltd. v. Vertin* (*Quadrant II*), 115 A.3d 535, 549 (Del. Ch. 2015). Plaintiffs may also plead a breach of the duty of loyalty

---

[5]    No Defendant has argued that the Debtor's LLC Agreement limits the Board Members' fiduciary duty of loyalty. Indeed, Meltzer and Herring assert that it does not do so. Meltzer and Herring do suggest that the Committee's claims for breach of the duty of care may be limited by an exculpatory provision of the Debtor's LLC agreement. The referenced clause states in relevant part that "a Manager or officer of the Company shall not be personally liable to the Company or its Members for monetary damages or breach of fiduciary duty as director provided that . . . such course of conduct did not constitute gross negligence or willful misconduct on the part of such Manager or officer." Am. & Restated LLC Ag't of Lincoln Paper & Tissue ¶ 9.1 (ECF No. 151-2). Gross negligence is the standard by which breaches of the duty of care are measured, and Delaware courts faced with similar provisions have found that they do not limit liability for breaches of the duty of care. *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015) ("Because the limitation of liability contained in [the] Agreement does 'not apply to the extent the act or omission was attributable to such Person's gross negligence, willful misconduct or knowing violation of law,' I conclude that the Agreement does not diminish the default standards of care and loyalty under Delaware law."); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664–65 (Del. Ch. 2012) (interpreting exception in exculpatory clause for gross negligence and noting that "[r]ather than eliminating fiduciary duties, the exculpatory language . . . recognizes their continuing existence. Gross negligence is the standard for evaluating a breach of the duty of care."). I therefore find that the Lincoln Agreement's exculpatory clause would have no impact on my analysis of the Committee's duty of care claims, and I do not consider that clause here.

[6]    The Committee's claims for breaches of fiduciary duties relate to the internal affairs of a Delaware LLC. I therefore apply Delaware law in considering those claims. *See, e.g., Freid v. Gordon*, No. CIV.A. 09-10928-DJC, 2011 WL 1157891, at *3 (D. Mass. Mar. 25, 2011); *see also Mariasch v. Gillette Co.*, 521 F.3d 68, 72 (1st Cir. 2008) ("The state with authority over a corporation's internal affairs is the state of incorporation.").

by demonstrating "that the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith." *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).

### 1. Conflicts of Interest

"To plead that a director was interested . . . , a plaintiff can allege facts showing that the director received 'a personal financial benefit from a transaction that is not equally shared by the stockholders.' " *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. CV 12108-VCL, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)). Alternatively, a plaintiff can allege that the director was a fiduciary to more than one entity, "and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders." *Id.* (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

"[A] lack of independence can be shown by pleading facts that support a reasonable inference that the director is beholden to a controlling person or 'so under their influence that their discretion would be sterilized.' " *In re Trados Inc. S'holder Litig.*, No. CIV. A. 1512-CC, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *Rales*, 634 A.2d at 936); *see also Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002). Allegations that a director has a relationship with a third party do not suffice absent some indication of how that affiliation influenced the director's decision-making. *See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, No. CIV.A. 20228-NC, 2004 WL 1949290, at *10 (Del. Ch. Aug. 24, 2004) ("[P]ersonal friendships, without more; outside business relationships, without more; and

approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.").[7]

### 2. Bad Faith

Plaintiffs may also plead a breach of the duty of loyalty by alleging "that the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith." *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d at 33. "[A] failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (*i.e.*, gross negligence)." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006). The directors must have engaged in "purposeful wrongdoing." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 653 (Del. Ch. 2008). For example, Delaware courts will find a failure to act in good faith:

> [W]here the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.

*Stone*, 911 A.2d at 369. "In cases where 'there is no indication of conflicted interests or lack of independence on the part of the directors,' a finding of bad faith should be

---

[7]      Nor can a plaintiff rely solely on allegations that the director was nominated to their position by the purportedly controlling party. *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

reserved for situations where 'the nature of [the director's] action can in no way be understood as in the corporate interest.'" *In re Saba Software, Inc. Stockholder Litig.*, No. CV 10697-VCS, 2017 WL 1201108, at *20 (Del. Ch. Mar. 31, 2017) (alteration in original), *as revised* (Apr. 11, 2017) (quoting *In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*, No. CV 9640-VCG, 2016 WL 3044721 (Del. Ch. May 20, 2016)); *see also In re Orchard*, 88 A.3d at 34 ("Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.").

## B.    The Fiduciary Duty of Care

Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005). "[I]n order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was recklessly uninformed or acted outside the bounds of reason." *DiRienzo v. Lichtenstein*, No. CV 7094-VCP, 2013 WL 5503034, at *29 (Del. Ch. Sept. 30, 2013); *see also In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008) ("The definition of gross negligence used in our corporate law jurisprudence is extremely stringent."). The key issues in evaluating a duty of care claim under the gross negligence standard are "whether there was a real effort to be informed and exercise judgment" and "whether the directors informed themselves . . . of all material information reasonably available to them." *In re Zale Corp. Stockholders Litig.*, No. CV 9388-VCP, 2015 WL 6551418, at *5 (Del. Ch. Oct. 29, 2015); *see also In re USA Detergents, Inc.*, 418 B.R. 533, 544 (Bankr. D. Del. 2009) (The "exact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform

themselves fully and in a deliberate manner."). The duty of care "is a process-oriented duty," and a claim for breach of that duty does not survive merely because the plaintiff has stated a claim for breach of the duty of loyalty. *See TVI Corp. v. Gallagher*, No. CV 7798-VCP, 2013 WL 5809271, at *13 (Del. Ch. Oct. 28, 2013).

## C. Fiduciary Duties of Directors of Wholly-Owned Subsidiaries

Wholly-owned subsidiaries "are expected to operate for the benefit of their parent corporations; that is why they are created." *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 173 (Del. Ch. 2006) *aff'd* 931 A.2d 438 (Del. 2007). For this reason, in most circumstances "the fiduciary duties owed by directors of wholly owned subsidiaries run only to the parent." *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1208 (Del. Ch. 2010); *In re Tropicana Entm't, LLC*, 520 B.R. 455, 470-71 (Bankr. D. Del. 2014) (applying the same rule in the context of a wholly-owned subsidiary LLC); *see also Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."); *accord Quadrant Structured Prod. Co. v. Vertin* (*Quadrant I*), 102 A.3d 155, 183-84 (Del. Ch. 2014). Delaware law does not foreclose claims for breach of fiduciary duties against the directors of a wholly-owned subsidiary—plaintiffs are free to allege that the subsidiary's directors acted disloyally to the entities whose joint interests they serve. *E.g. Hamilton Partners*, 11 A.3d at 1210. However, a plaintiff "cannot state a claim against the directors of a wholly owned subsidiary merely by alleging that the directors acted in the best interests of the parent and to the detriment of the

subsidiary." *Id.* That board members' actions to benefit a parent "may reduce the value of the subsidiary conceived as a stand-alone entity . . . in itself is of no moment." *Trenwick*, 906 A.2d at 202.[8]

This analysis changes when the subsidiary is insolvent or where the transaction at issue would render the subsidiary unable to meet its legal obligations. *See Trenwick*, 906 A.2d at 202-03 & n.96; *see also Asmussen v. Quaker City Corp.*, 156 A. 180, 181 (Del. Ch. 1931) ("If an insolvent corporation should undertake to turn its assets over to stockholders, leaving creditors unpaid, I think no dissent can be found to the proposition that the law would condemn the effort."). In analyzing whether a wholly-owned subsidiary's transfer of value to its parent gave rise to a claim for breach of the duty of loyalty, the Delaware Chancery Court explained that:

> "[W]hen a corporation is *insolvent*, . . . its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." Directors continue to have an obligation to maximize the value of the firm, but now a transfer of value to the sole stockholder does not inure to the ratable benefit of all of the residual claimants. The payment now transfers value previously owned beneficially and indirectly by all of the residual claimants to the party in control of the corporation.

*Quadrant I*, 102 A.3d at 184 (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007)). That is, insolvency brings another constituency to the fore (the creditors) whose interests may conflict with the interests of the sole shareholder and who the directors must account for. *Id.* (adopting theory that when a corporation is insolvent "directors who are also fiduciaries for a sole or

---

[8] *See also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366-67 (3d Cir. 2007), *as amended* (Oct. 12, 2007) ("While we normally assume that a corporation's primary interest is in maximizing its economic value, the only interest of a wholly owned subsidiary is in serving its parent. That doing so may not always involve maximizing the subsidiary's economic value is of little concern.").

controlling stockholder . . . face the dual-fiduciary problem in a context where the interests of the primary residual claimants (the creditors) diverge from those of the equity"); *see also Quadrant II*, 115 A.3d at 546-47 ("The directors of an insolvent firm do not owe any particular duties to creditors. They continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors."); *cf. Prod. Res. Grp., L.L.C. v. NTC Grp., Inc.*, 863 A.2d 772, 791 (Del. Ch. 2004) (after insolvency, "directors continue to have the task of attempting to maximize the economic value of the firm" but "the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end").

## DISCUSSION

All Board Members seek to dismiss Count I of the Complaints on the grounds that the Committee has failed to state a claim for a breach of the duty of loyalty. They argue that the Complaints do not allege sufficient facts to show that they were self-interested and that the Committee has insufficiently plead that they acted in bad faith. The Board Members also assert that the Committee is judicially estopped from alleging bad faith in the Complaints because doing so would be contrary to statements the Committee made before the Bankruptcy Court. Meltzer and Herring seek to dismiss Count II, contending that the MHF Complaint's allegations are insufficient to state a claim for breach of the duty of care. Meltzer further argues that Counts III-

V should be dismissed because the MHF Complaint fails to allege that he received a

fraudulent transfer.[9]

## I. Whether the Committee Has Stated Claims for Breach of the Duty of Loyalty against the Board Members

The Committee alleges that the Board Members violated their duty of loyalty

to the Debtor by pursuing a cash settlement with FM Global instead of rebuilding the

boiler and by using the insurance settlement funds to make distributions to LPTH.

The Committee claims that by doing so, the Board Members acted in bad faith by,

---

[9]     Meltzer also argues that all of the Committee's purported claims against him are barred by the Release. The Committee responds that they have adequately alleged that the Release was not supported by consideration, and that therefore I must assume for the purposes of this motion that the Release is invalid.

"[A] release is valid and binding . . . when the release is supported by consideration, and when there has been no fraud, misrepresentation, mistake, duress, or undue influence." *Fox v. Rodel, Inc.*, No. 98-531-SLR, 1999 WL 588293, at *8 (D. Del. July 14, 1999). "[F]orbearance to sue is valid consideration whether the suit would have been successful or not," however, "in order for the relinquishment of a claim against another to be valid consideration, the claim must be honest, genuine, advanced in good faith, and founded on some reasonable, tenable or plausible ground." *Hensel v. U.S. Elecs. Corp.*, 262 A.2d 648, 650 (Del. 1970); *accord Se. Chester Cty. Refuse Auth. v. BFI Waste Servs. of Penn., LLC*, No. CV K14C-06-016 JJC, 2017 WL 2799160, at *4 (Del. Super. Ct. June 27, 2017).

Here, the Committee alleges that "Meltzer did not provide any consideration for the Release." MHF Compl. ¶ 55. The Committee also alleges that "[n]either CalPERS nor Meltzer provide any consideration to the Debtor for the purported release of the Debtor's claims against Meltzer, as set forth in the Release." MHF Compl. ¶ 146. While these allegations are spare, that does not mean they are conclusory. The Committee need not list all of the kinds of consideration that Meltzer did not give in exchange for the Release when it may just as simply be said that he gave none, *see* Fed. R. Civ. Pro. 8(a)(2), and the latter allegation is as much a factual statement as is the former.

The Release's terms do not negate the Committee's allegations. Delaware's courts recognize that a contract can falsely recite consideration, and that while a court should "refrain[] from questioning the 'adequa[cy]' of bargained-for consideration, it may still inquire as to its 'existence.' " *Seiden v. Kaneko*, No. CV 9861-VCN, 2015 WL 7289338, at *6 (Del. Ch. Nov. 3, 2015) (second alteration in original); *see also* 3 Williston on Contracts § 7:23 (4th ed.) ("It would destroy the requirement of consideration to hold that an admission of consideration in an unsealed writing prevented the promisor from showing that no consideration existed."). Likewise, Meltzer's representations that he held claims against the other parties to the Release are not enough to conclusively establish, particularly on a motion to dismiss, that those claims existed or that they could have served as consideration. *See Hensel*, 262 A.2d at 650. Meltzer may ultimately show that he gave consideration for the Release and that it is binding. However, I assume for the purposes of deciding Meltzer and Herring's motion to dismiss that the Release does not bar the Committee's claims against Meltzer, and I deny Meltzer and Herring's motion to dismiss as to Count XI.

among other things, failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties, or acting with a purpose other than advancing the Debtor's best interests. VSW Compl. ¶ 61. Because the Debtor's distributions to LPTH were passed on to Van Scotter, Wissmann, and Fisher, the Committee further argues that those Defendants violated their duty of loyalty by placing their own financial interests ahead of those of the Debtor. VSW Compl. ¶ 61; MHF Compl. ¶ 62. The Committee does not allege that Meltzer or Herring received any part of the distributions. However, the Committee argues that Meltzer and Herring were beholden to entities associated with CalPERS, an LPTH shareholder, and that Meltzer and Herring violated their duties of loyalty to the Debtor by placing CalPERS's interests ahead of the Debtor's. MHF Compl. ¶ 62.

In their motions to dismiss, the Board Members offer a volley of defenses, including that they cannot be considered self-interested or lacking independence under binding Delaware law, that the Complaints fail to allege that the Board Members acted in bad faith, and that the Debtor's structure forecloses any duty of loyalty claim.[10]

---

[10]     Van Scotter and Wissmann argue that the Defendants cannot have breached their duty of loyalty to the Debtor because of the Debtor's structure, either by analogy to 8 Del. Code § 144 or by reference to the practical impossibility that an LLC's board would remain employed if they acted contrary to the wishes of that LLC's sole member. The Committee responds to Van Scotter and Wissmann's arguments by asserting the general proposition that directors owe duties to a corporation and its shareholders. The cases the Committee cites for this proposition, however, either contradict the Committee's position or do not address fiduciary duties in the context of a wholly-owned subsidiary. *See Quadrant Structured Prods. Co. v. Vertin* (*Quadrant I*), 102 A.3d 155, 184 (Del. Ch. 2014) ("When a controller owns 100% of a corporation's equity and the subsidiary is solvent, the interests of the corporation and its fiduciaries are fully aligned with those of the controller. The fiduciary duties of the directors and officers require that subsidiary be managed for the benefit of the controller."); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) (suit for breach of fiduciary duty brought by subsidiary's minority shareholders).

## A. Whether the Board Members Had a Conflict of Interest

Under the corporate structure alleged, LPTH is the Debtor's sole member. The Board Members served on the Boards of both the Debtor and its parent LPTH. Delaware law is clear that the directors of a solvent, wholly-owned subsidiary may transfer value to a parent company. The "subsidiary board is permitted to act to benefit its parent, not simply the subsidiary itself, for the obvious reason that wholly-owned subsidiaries are formed by parents to benefit the parents, and not for their own sake." *See Trenwick*, 906 A.2d at 202. Creditors "cannot state a claim against the directors of a wholly owned subsidiary merely by alleging that the directors acted in the best interests of the parent and to the detriment of the subsidiary." *Hamilton Partners*, 11 A.3d at 1210.

In order to state a claim, the Committee must surmount one of two hurdles: Either it must plead that the that the Debtor was insolvent at the time of the transactions at issue or became insolvent as a result of them,[11] or it must plead that the Board Members acted disloyally in some way other than by merely transferring value from the Debtor to LPTH.

---

[11] Delaware's courts have suggested that insolvency must shortly, if not immediately, follow the transaction in question. In particular, Delaware's courts have rejected the notion that directors must attend to creditors' interests when the entity the directors serve is operating in the "zone of insolvency," a vaguely-defined period of almost-but-not-quite insolvency. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners.").

The Committee fails to meet the first hurdle. The Committee conceded at oral argument[12] that it has not plead facts sufficient to allege that the Debtor was or became insolvent any time before it filed for bankruptcy on September 28, 2015. The Committee insists that insolvency does not change the character of the directors' fiduciary duties, and that it is relevant only to the question of whether creditors have standing to bring derivative actions on a company's behalf. It is true that insolvency does not change the character of the directors' fiduciary duties. Regardless of an entity's solvency, its directors owe a fiduciary duty to the entity to maximize its value for the benefit of its residual interest-holders. That duty is unchanging. But insolvency is not merely relevant to the issue of standing. Under the facts alleged, insolvency also impacts whether there exists a claim for the Committee to sue on.[13] As the Court of Chancery explained in *Quadrant I*, "[a] transfer of value from a

---

[12]    The referenced oral argument took place before me on April 26, 2018. The parties had previously argued their motions to Judge Cary on November 17, 2017, before I granted the motions to withdraw the reference.

[13]    During the April 26th oral argument, counsel for the Committee directed me to language from *Quadrant I* and *Production Resources* to the effect that "creditors are not prevented from bringing derivative claims that pre-date the corporation's insolvency." *Quadrant I*, 102 A.3d at 180 (citing *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 792 (Del. Ch. 2004)). Well and good. However, in both cases the plaintiffs had adequately plead that the relevant corporations were insolvent at the time of their directors' challenged conduct, and therefore neither case addressed whether a breach of fiduciary duty had taken place before the corporation's insolvency. *See Quadrant I*, 102 A.3d at 177 ("The Complaint's allegations support a reasonable inference that [the Company] has been insolvent under the balance sheet test since before the . . . takeover [by the owner of all of the Company's equity]."); *Prod. Res. Grp., L.L.C.*, 863 A.2d at 778 ("The complaint sets forth several facts, reported in NCT's public filings, that support a rational inference that NCT has been insolvent for several years."). Just what the Committee's quote from *Production Resources* means is not entirely clear to me, but I can envision a pre-insolvency breach of fiduciary duty that the creditors could sue on. If, for instance, the directors had taken the insurance proceeds and bet it all on "My Boy Jack" to win at the Kentucky Derby, they would have lost everything and breached their fiduciary duties to boot. In that case, the creditors may well have had standing to sue *and* a pre-insolvency claim to sue on. Here, however, the Committee has not alleged any similar pre-insolvency breach.

solvent subsidiary to the holder of 100% of the equity cannot give rise to a fiduciary wrong." *Quadrant I*, 102 A.3d at 184. The Delaware courts have set the point at which the Board Members' focus must shift to include creditors' interests firmly at the point of insolvency. *Quadrant II*, 115 A.3d at 546-47; *see supra* note 10.

Having stumbled at the first hurdle, the Committee must plead that the Board Members acted disloyally in some way other than by merely transferring value from the Debtor to LPTH. The Committee does not raise any plausible inference that the Board Members acted disloyally in the traditional, self-interested sense. The Committee alleges that the Distributions were first made to LPTH, the Debtor's sole member. Therefore, there is no claim that the Distributions' benefits were distributed unequally among the Debtor's shareholders.

Further, the fact that LPTH passed funds from the Distributions on to Van Scotter, Wissmann, Fisher, and CalPERS does not suffice to allege that the Board Members engaged in self-dealing. What *LPTH* did with the Distributions *after* they were made is not at issue here, where the Committee has challenged the Board Members' actions on behalf of *the Debtor*, not on behalf of LPTH. And even if I ignored that the Distributions passed through LPTH—a separate legal entity—before reaching LPTH's members, the Committee has not alleged that any of the Board Members received a personal benefit not received by other shareholders of LPTH. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993).[14]

---

[14] The Committee relies on *Cede & Co. v. Technicolor*'s statement that "a director who receives a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent," to suggest that *any* alleged benefit that flowed to the Board Members suffices to show self-interest or a lack of independence. Fisher Opp'n 6 n.5 (ECF No. 152) (citing *Cede & Co. v.*

The Committee also cannot plausibly contend that the Board Members must have acted disloyally because they served as fiduciaries for both the Debtor and LPTH. Up to the point of the Debtor's insolvency, the Debtor's and LPTH's interests were aligned, and the Board Members' actions on LPTH's behalf presented no inherent conflict of interest. *Quadrant I*, 102 A.3d at 184.

The Committee's arguments regarding the Board Members' independence likewise fail. The Committee suggests that Van Scotter and Wissmann lacked independence because they were employed by the Debtor as its CEO and CFO. The case on which the Committee relies for this argument does not support the asserted proposition, *see* Opp'n to MH Mot. 18 (ECF No. 153) (citing *Revlon, Inc. v. MacAandrews & Forbes Holdings, Inc.*, 506 A.2d 173 n.3 (Del. 1986)),[15] and the Committee offers no other insight into why Van Scotter or Wissmann's employment by the Debtor would have impacted their independence.

---

*Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993)). As Fisher notes in his Reply, this statement did not mark a shift in Delaware law regarding self-interested transactions. Fisher Reply 6 (ECF No. 154). I have found no Delaware authority to suggest that after *Cede*, plaintiffs can allege self-interest or a lack of independence merely by asserting that some benefit ran to a director, even if that benefit was shared by all shareholders. Moreover this reading would conflict with the *Cede* court's own statement of Delaware law on this issue, that "[e]ssentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder *and not shared by the stockholders generally*." *Id.* at 361 (emphasis added).

[15]    The Committee places great weight on a footnote from *Revlon* to the effect that because certain Revlon directors were also employed by Revlon, they could not be considered "truly outside independent directors." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 n.3 (Del. 1986). *Revlon* assessed whether directors breached their fiduciary duties through their efforts to fend off a corporate acquisition. Although it is difficult to discern the *Revlon* court's full meaning from its brief notation, the court may have inferred that the directors acted to keep their jobs rather than in the company's interest. This would be in line with the court's acknowledgment that "when a board implements anti-takeover measures there arises the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders." *Id.* at 180 (quotations omitted). The Committee raises no such specter here.

As for Meltzer and Herring, the MHF Complaint's only allegations regarding their independence are that they were employed by CalPERS affiliates and that they were designated to the Debtor's board by CalPERS. Under Delaware law, neither of these facts, standing alone, would suffice to create the inference that Meltzer and Herring were beholden to CalPERS, and the Committee does not explain why they should do so in combination. *See Elkins*, 2004 WL 1949290, at *10; *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d at 996.[16]

Having found that the Committee has not adequately plead that the Board Members had any conflicts of interest, I turn to the question of whether the Board Members acted in bad faith.

## B.     Whether the Board Members Acted in Bad Faith[17]

In light of the fiduciary duties of directors of wholly-owned subsidiaries, the Committee has also failed to adequately allege that the Board Members acted in bad

---

[16]     Even if, on a liberal reading, the MHF Complaint alleged that Meltzer and Herring had reason to pursue CalPERS's interests, that would not help the Committee, as they have alleged that CalPERS received a *pro rata* benefit which was identical to what the other shareholders received. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971) (applying business judgment standard to decision by dominated board to grant a dividend because the dividend was distributed *pro rata* to the company's shareholders).

[17]     The Board Members argue that the Committee is judicially estopped from asserting claims that are based in bad faith. This argument stems from comments made by Committee counsel during a hearing before the bankruptcy judge, that no criminal, intentional or willful misconduct by Wissmann or Van Scotter had been discovered "to date." *See* Hearing Tr. 36:18-38:11, *In re Lincoln Paper & Tissue, LLC*, Docket No. 15-10715 (Me. Bankr. May 12, 2016) (ECF No. 886). In determining whether judicial estoppel should apply, courts are guided by whether (1) a party's later position was clearly inconsistent with its earlier position; (2) the party succeeded in persuading a court to accept that party's earlier position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment if not estopped. *United States v. Szpyt*, 785 F.3d 31, 41 (1st Cir. 2015). Because of Committee counsel's temporal qualification, the prior statement is not "clearly inconsistent" with its present claims of bad faith. Further, Committee counsel's statements, which fill two paragraphs of a 50 page transcript, were not the main focus of the hearing, which revolved around the U.S. Trustee's objection to a proposed Compromise Order that would allow Van Scotter and Wissmann to continue working for the Debtor in exchange for limitations on personal

faith. The Complaints' allegations do not describe a transaction that can "in no way be understood as in the corporate interest" of the Debtor's sole member, LPTH. *See In re Saba Software*, 2017 WL 1201108, at *20. Nor do the Complaints' allegations regarding the Board Members' decision-making process suggest intentional misconduct rising to the level of bad faith. *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 542 (Bankr. D. Del. 2009) (directors' failure to undertake typical due diligence, including obtaining a financial assessment or "clean" auditor opinions, supported a claim for breach of the duty of care but not breach of the duty of loyalty).

The closest that the Committee comes to a theory of bad faith is through its suggestion that the Board Members drove the Debtor's business into insolvency with the intention of benefitting themselves while leaving the Debtor's creditors high and dry. It is not apparent to me that Delaware would recognize this theory. Delaware has been clear that insolvency marks the point at which a corporate fiduciary must consider the creditors. *See Trenwick*, 906 A.2d at 197-98 (finding plaintiffs' theory that defendants set out to defraud creditors factually unsupported, and suggesting that theory would not be viable absent an indication that the company was or became insolvent at the time of the defendants' conduct). Delaware courts are careful not to enlarge the fiduciary duties of directors, and they frequently point out that a

---

liability and a release of certain third-party claims. Judge Cary, who ruled a day after the hearing, did not refer back specifically to the comments of Committee counsel in making his order, and the claim of judicial "acceptance" is wobbly at best. Accordingly, I conclude that the Committee is not judicially estopped from raising a bad-faith based claim at this juncture.

creditors' lack of a cause of action under the law of fiduciary duties does not leave them without a remedy.

> It is important to point out that my refusal to conclude that a wholly-owned subsidiary may sue the directors of its parent company on the premise that their improvident business strategies ultimately led to the bankruptcy of the subsidiary does not leave open a gap in the law. There is no chasm. The laws of all states and the federal bankruptcy laws address precisely the scenario the [Debtor] contends occurred in the reorganization but fails to plead. They do so through a body of law that might be fairly called the "law of fraudulent transfer."

*Trenwick*, 906 A.2d at 198; *see also Gheewalla*, 930 A.2d at 99 ("While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights."); *accord Quadrant I*, 102 A.3d at 176. The theory advanced by the Committee's counsel at the April 26 oral argument—that there was "unreasonably small capital" leading to insolvency—falls squarely within the law of fraudulent conveyances, an avenue of recovery that the Committee has also pursued in these actions.

Even if the Committee's bad-faith theory is available, I find that the Committee has failed to plausibly plead within its confines. Drawing reasonable inferences in the Committee's favor, the Complaints allege that despite knowing that the boiler was significant to the Debtor's ongoing financial health and despite substantial insurance coverage which could have covered replacement and compensated for business interruption losses, the Board Members made their decision to forgo rebuilding the boiler in order to ensure that LPTH and its members

27

(including themselves, in the case of Van Scotter, Wissmann, and Fisher) would receive cash distributions. *See* VSW Compl. ¶¶ 29, 32. The Complaints also allege that one week after deciding not to rebuild the boiler, the Board Members voted to distribute funds to LPTH even though they were aware at that time that the Debtor's mill was in a precarious financial condition. VSW Compl. ¶ 41. On the alleged facts, an inference can be drawn that at the time of these decisions, the Board Members knew that the mill might eventually need to be shut down. Further, the Complaints allege that Van Scotter, Wissmann, and Fisher voted to make a second Distribution to LPTH without reviewing updated financial projections for the Debtor. VSW Compl. ¶¶ 44-46. Taken together, these allegations suggest that the Board Members elected to take funds from the Debtor in order to ensure LPTH's—or their own—short-term access to cash, and in doing so acted to benefit LPTH and its members knowing that doing so was to the Debtor's detriment.

What the Committee does not allege is that the Board Members knew their choices would cause the Debtor to fail as a going concern or that they purposefully set out to defraud the Debtor's creditors. *See Stone*, 911 A.2d at 654 (to rise to the level of bad faith, misconduct must be intentional). There are no allegations about the Debtor's assets, and only spotty allegations about the Debtor's liabilities. Remember that it is acceptable, even required, for the directors of a solvent wholly-owned subsidiary to serve its parent's interests, and that the Committee has clarified that it is not claiming that the Debtor became insolvent when the Distributions were made. While the Committee attempts to draw a straight line between the initial

decision not to rebuild the boiler and the Debtor's insolvency, those events were separated by a span of two years. And while the Committee points to various costs and debts that the Board Members knew or should have known would accrue if they chose not to rebuild the boiler or to make the Distributions, the Complaints do not allege that the Board Members also knew that the Debtor would be unable to absorb those costs. The Committee's counsel hinted at the oral argument before the Bankruptcy Court that he had uncovered additional evidence that supports a claim of intentional misconduct. He has not moved to amend the Complaints, and without facts to support it, the theory is not adequately plead.

In light of the foregoing, I find that the Complaints fail to state a claim against the Board Members for breach of the duty of loyalty.

## II. Whether the Committee Has Stated a Claim for Breach of the Duty of Care against Meltzer and Herring

Meltzer and Herring argue that the Committee's claims against them for breach of the duty of care should be dismissed because the Committee has failed to allege that they engaged in grossly negligent conduct. Meltzer and Herring note that the Committee's allegations largely support a conclusion that the Board Members endeavored to inform themselves before deciding not to rebuild the boiler and before the First Distribution.

Setting aside the Board Members' initial decision to accept a cash insurance settlement and to make the First Distribution, the Committee alleges that when the Board Members were considering the Second Distribution, Herring asked Van Scotter and Wissmann to provide updated financial projections for the Debtor to support

29

those distributions. VSW Compl. ¶ 44. The Committee further alleges that Van Scotter and Wissmann did not provide those materials but that Van Scotter, Wissmann, and Fisher nevertheless went forward with the vote on that distribution. VSW Compl. ¶¶ 45-46. In light of the Debtor's purportedly tenuous financial condition, this alleged failure to obtain or to consider updated projections before making the Second Distribution is enough to suggest gross negligence and to support a claim for breach of the duty of care.[18] The critical question becomes, then, whether this lapse can be imputed to Meltzer and Herring. Meltzer and Herring aver that it cannot because they did not participate in the vote on the Second Distribution.

"[N]o per se rule unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction." *In re Tri-Star Pictures, Inc., Litig.*, No. CIV. A. 9477, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995). Delaware courts have found that a director "who abstains[19] from a vote on a transaction may nevertheless face liability if she play[ed]

---

[18]    Unlike the duty of loyalty, the duty of care is process-based. A change in the object of that duty therefore does not necessarily change what is required to satisfy the duty. Here, the Board Members' duties ran to their parent, LPTH, and Delaware courts have cautioned against holding subsidiary directors liable for a breach of the duty of care where they merely followed a strategy set by their parent. *See Trenwick.* 906 A.2d at 202 ("[B]ecause the Trenwick America board, as directors of a wholly-owned subsidiary, was entitled to follow the parent's instructions unless those instructions required the board to violate the legal rights of others, no due care claim may be brought against them."). Here, however, the MHF Complaint does not allege that LPTH instructed the Debtor to make the Distributions, and so, to the extent that the Board Members evaluated the Second Distribution's merits in the first instance, they were required to exercise due care in doing so.

[19]    The same rule applies to directors who were absent during a vote. *See Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1166 (Del. Ch. 2006) (absence during vote did not excuse defendant from fiduciary duty claims because he "was closely involved with the challenged merger from the very beginning. Its completion was literally premised on his involvement, and this court's conclusion that the transaction was unfair is based, in large part, on [his] failures to properly conduct the parent-subsidiary negotiation"); *cf. In re Tri-Star*, 1995 WL 106520, at *3 (directors' absence shielded them from liability

a role in the negotiation, structuring, or approval of the proposal," or "if the director was closely involved with the challenged [transaction] from the very beginning and the transaction was rendered unfair based, in large part, on the director's involvement." *In re Oracle Corp. Derivative Litig.*, No. CV 2017-0337-SG, 2018 WL 1381331, at *20 (Del. Ch. Mar. 19, 2018) (quotations omitted); *see also Frederick Hsu Living Tr.*, 2017 WL 1437308, at *38 (directors "could be held liable even though they abstained from . . . formal votes" where it was "reasonably conceivable . . . [that they] engaged in behind-the-scenes communications with their fellow directors . . . on critical matters"). At least one Delaware court has taken the stronger position that fiduciary duty claims should proceed against abstaining directors so long as "there is evidence which shows that the directors could have formed an opinion based on reasonably available information." *In re Dairy Mart Convenience Stores, Inc.*, No. C.A. 14713, 1999 WL 350473, at *1 (Del. Ch. May 24, 1999) (emphasizing that "[t]he office of director is one that comes with affirmative fiduciary duties," and that "[i]t would hardly seem appropriate for directors, by their own choosing, to decide to abdicate those duties by not forming an opinion about a board decision").

Here, the MHF Complaint alleges that Meltzer and Herring were involved in the decisions to accept a settlement from the Debtor's insurer and to make the First Distribution, both of which were precursors to the Second Distribution. The Committee also alleges that *all* of the Board Members convened ahead of the vote on

where the plaintiff failed to allege that they "played any role, overt or covert, in the board's decision-making process").

the Second Distribution, at which time Herring requested updated financial projections that were not provided. MHF Compl. ¶ 42-44. At the pleading stage, this is sufficient to plausibly infer that Meltzer or Herring were directly involved in the decision to make the Second Distribution even if they elected not to participate in the vote. I therefore find that the MHF Complaint alleges sufficient facts to state a claim for breach of the duty of care against Meltzer and Herring.[20]

## III. Whether the Committee Has Stated Fraudulent Transfer Claims Against Meltzer

Meltzer also moves to dismiss the Committee's fraudulent transfer claims against him on the basis that the MHF Complaint contains only conclusory allegations in support of those claims.

Under § 548(a)(1)(B) of the Bankruptcy Code, a transfer by a debtor made within two years of the bankruptcy filing may be avoided as a constructively fraudulent transfer if the debtor "received less than a reasonably equivalent value in exchange" for the transferred property and if, as applicable here, the debtor:

---

[20]     Meltzer and Herring assert that the Board Members' decisions that are the subject of these actions are entitled to the protection of Delaware's business judgment rule. MH Mot. 13 (ECF No. 151). "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. CV 12108-VCL, 2017 WL 1437308, at *25 (Del. Ch. Apr. 14, 2017). The default standard of review is the "business judgment rule," under which courts presume that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 52 (Del. 2006) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). Where the business judgment rule has been raised as a defense, to survive dismissal under Rule 12(b)(6) a plaintiff "must plead that he overcomes the presumption created by the rule." *In re CTC Comm'c'ns Grp., Inc.*, No. 02-12873PJW, 2007 WL 760389, at *3 (Bankr. D. Mass. Mar. 13, 2007). To do so, the plaintiff "must allege facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority." *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *26. Because I find that the Complaints state a claim for breach of the duty of care, I accordingly find that the Committee has successfully plead around the business judgment rule.

> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B)(ii)(II)-(III). The elements of constructive fraud under Maine's Uniform Fraudulent Transfer Act, 14 M.R.S. § 3575(1)(B), "are substantially similar, although not textually identical" to those under § 548(a)(1)(B)(ii)(II) and (III). *In re Maine Poly, Inc.*, 317 B.R. 1, 8 (Bankr. D. Me. 2004).[21]

I have already found that the MHF Complaint alleges that Meltzer gave no consideration for the Release. I have also found that the MHF Complaint states a claim against Meltzer for breach of the duty of care based on conduct that took place before the Release. The MHF Complaint therefore successfully alleges that the Release was an exchange of unequal value: something for nothing. The MHF Complaint also alleges that Meltzer obtained the release (1) six months after the Debtor had obtained outside financing just to remain in operation; (2) two months after the Debtor had retained an investment banker to market its business for sale; and (3) two months before the Debtor filed for bankruptcy. These allegations suffice to suggest that the Debtor was engaged or soon would engage in transactions for which it would lack adequate capital, or that it might incur debts beyond its ability to repay. The MHF Complaint therefore states a claim under 11 U.S.C. § 544 and 14

---

[21] The Committee's Counts VII and VIII assert claims under § 544(b) of the Bankruptcy Code. Section 544(b) permits the avoidance of transfers that are voidable under applicable law by an unsecured creditor. 11 U.S.C. § 544(b). The referenced "applicable law" includes state fraudulent transfer statutes such as the Maine Uniform Fraudulent Transfer Act. *See In re Catco Recycling, LLC*, No. AP 15-1012-BAH, 2016 WL 556173, at *7 (Bankr. D.N.H. Feb. 10, 2016).

M.R.S. §§ 3575 and 3578, as well as under 11 U.S.C. § 548(a)(1)(B). Meltzer's motion to dismiss Counts VII-X is denied.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Fisher's motion for leave to appeal and **GRANTS** Fisher's motion to dismiss, **GRANTS** Meltzer and Herring's motion to dismiss as to Count I but otherwise **DENIES** Meltzer and Herring's motion to dismiss, and **GRANTS** Van Scotter and Wissmann's motion to dismiss.

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 8th day of May, 2018.